**In the Matter of the PROTECTIVE PROCEEDINGS OF W.A., Appellant.**

**No. S–12673.**

Supreme Court of Alaska.

Sept. 26, 2008.

---

24. *Id.* at 1373.

25. *Id.*

Joseph R. Faith, Dillingham, for Appellant.

Janella K. Combs, Bristol Bay Law Center, Dillingham, for Gladys L., Appellee.

Before: FABE, Chief Justice, MATTHEWS, CARPENETI, and WINFREE, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

The respondent in a guardianship proceeding appeals the superior court's appointment of a permanent guardian. He argues that the superior court was not presented with clear and convincing evidence that (1) he is totally incapacitated and (2) alternatives to guardianship are not feasible. Because the

superior court did not err in finding that there was clear and convincing evidence that the respondent is incapacitated and that alternatives to guardianship are not feasible, we affirm the decision of the superior court.

## II. FACTS AND PROCEEDINGS

This case involves an attempt by a group of adult siblings to obtain a guardian for W.A., their brother. W.A. is a forty-five year old male who has not held regular employment for over twenty years. Until this case arose, he lived with his eighty-one year old mother, who has serious health problems and takes oxygen. W.A.'s father died when W.A. was four or five years old. According to W.A.'s sister, Gladys L., W.A. "started using drugs at a very young age," which "had a very detrimental impact on his mental capacity," but his mother continually "cared for him and didn't want to turn him out to the street."

On February 9, 2005, Gladys L., joined by other siblings and family members, filed an "Emergency Petition for Appointment of a Temporary Guardian" and a "Petition for Appointment of a Guardian" as a result of W.A.'s erratic behavior and abusive treatment of their mother. Gladys L. filed the petitions because W.A.'s behavior had reached the point that it was "causing [the siblings] to fear for [their] mother's safety not to mention her life and others' safety," and "the prospect of him hurting her or himself" was "escalating."[1] Gladys L. alleged that W.A. struggled with mental illness and chronic substance abuse. She stated that W.A. "will not leave the house unless he is drunk," that he forces their "81 year old mother to stay in her bedroom beginning 10 pm until morning," which forces her "to urinate in a can in her bedroom," that he is "verbally abusive and controlling," that he "talks to an imaginary companion," and that he "speaks all thoughts out loud and laughs to himself."

Magistrate Monte L. Brice, acting as a Master for the Superior Court, held an initial hearing when the petition was filed on February 9. A second hearing was held on February 11 to consider the emergency petition for a temporary guardian. Participating in the hearing were W.A., his attorney Joseph Faith, various members of the family who were co-petitioners with Gladys L., Elizabeth Donnelly of the Office of Public Advocacy (OPA), court-appointed visitor[2] Marieann Vassar, and court-appointed expert medical professional Dr. Kathy Hyndman. Magistrate Brice ordered W.A. to submit to interviews with the court visitor's office and an expert physician in order to obtain better information on W.A.'s capacity. However, the magistrate continued the hearing on the emergency petition until February 15 so that W.A.'s counsel could have more time to prepare and the requisite interviews could be conducted.

Before the continued hearing, expert physician Dr. Dave Powers interviewed W.A. and submitted to the court a report outlining his conclusions from that interview. The interview and report were intended to focus on whether W.A. "lacks a capacity to make informed decisions about care and treatment services." Dr. Powers summarized his findings:

> [W.A.] has lived with his mother his entire life. He has no job or job training, he has no bank account, he has never paid a bill, had never ordered an item from a catalog. He doesn't shop for groceries or clothing, and doesn't even buy his own cigarettes. He also certainly has very limited or inadequate housekeeping, cooking, and self care skills. I do not think that [W.A.] has the ability to adequately manage his own financial affairs or household affairs.

Magistrate Brice heard testimony on February 15 and 16. Dr. Powers testified that

---

1. It does not appear that any single event involving W.A. prompted the decision to file the petition.

2. AS 13.26.106(c) requires the court to appoint a visitor and states, "[t]he visitor shall arrange for evaluations to be performed and prepare a written report to be filed with the court.... The

visitor shall interview the respondent.... The visitor shall conduct the interviews and investigations necessary to prepare the report...." AS 13.26.106(d) states that the appointment of the visitor "shall be made through the office of public advocacy."

"[W.A.] pretty staunchly, steadfastly denies that he has any problems with either alcohol abuse or with any kind of mental illness" even though "he has been diagnosed with both of those problems," and that this denial "makes it very difficult for him to ever receive treatment." When asked about his recommendation, Dr. Powers stated that he "would recommend that [W.A.] get a temporary guardian and also that he undergo a neuropsychiatric evaluation." Members of W.A.'s family also testified. W.A.'s sister, Janice B., testified that W.A. did not appear to bathe regularly. Frank W., W.A.'s nephew who lived with W.A. for a period of time, testified that he has not seen W.A. cook or do laundry and that there have been incidents in which W.A. "starts talking delusional." Frank also testified that W.A. often remains isolated in the back room of his mother's house and rarely goes "past the porch."

The court visitor testified regarding the report she submitted after her interview with W.A., in which she explained that "[W.A.] would benefit from the appointment of a temporary guardian." She testified that W.A. was successful with simple tests involving memory and short term learning abilities, such as identifying his address and objects such as a house, a bus, and a dog. However, W.A. was unable to perform a simple mathematical test of "subtract[ing] seven from 100 and ... subtracting seven from the answer from his previous subtraction" until he was told to stop. The court visitor testified that W.A. was unable to tell her when he was born; instead he responded to her inquiry by saying that he did not "own anything before 1979." W.A. had mixed results on various other simple tests, but he did show that he had the ability to communicate in writing and spell simple words correctly. When asked to make a conclusion in the context of the temporary guardianship statute, AS 13.26.140, the court visitor stated, "I can't in good faith say that this meets all the criteria for an emergency appointment."

After hearing all testimony Magistrate Brice released a "First Interim Master's Report" on February 22, in which he concluded that he could not "find by clear and convincing evidence that the statutory criteria for

the appointment of a temporary guardian was met." Magistrate Brice noted that "the main concern of the petitioners is, in fact, the protection of [W.A.'s mother] from [W.A.], but that the welfare of [W.A.] is a secondary concern." He also explained that he would await legal memoranda from the court visitor and from W.A.'s attorney discussing the court's authority to make an appointment of someone "to serve in a capacity similar to but without the full authority of a temporary guardian" before submitting a follow-up master's report.

On February 23, the court visitor submitted a brief to the superior court, in which she appeared to reverse course from her hearing testimony by stating that "[W.A.] could meet the requirements for the appointment of a temporary guardian as set out in AS 13.26.140." On March 14 she submitted supplemental materials documenting W.A.'s various trips to the emergency room at Alaska Native Medical Center in Anchorage. The court visitor explained in her supplemental brief that the records reflect W.A.'s pattern of "accessing medical services at the emergency room for alcohol related injuries." The records also reveal that W.A. "is consistently diagnosed with schizophrenia and alcohol abuse" when he visits the emergency room.

Magistrate Brice submitted a "Second Interim Master's Report" on March 30. The first issue addressed in the report was the following: "Where the criteria for appointing a temporary guardian have not been proved by clear and convincing evidence, can a temporary 'partial' guardian be appointed?" The magistrate stated that he remained unconvinced that the petitioners had met the statutory standard for appointment of a temporary guardian, even if the temporary guardian would be a "partial" guardian. Thus, the magistrate recommended that the request for a temporary guardian be denied, but without prejudice. He also recommended that the court grant any motion by the visitor for a neuropsychological evaluation.

On June 8, pursuant to the "Second Interim Master's Report" and a request by the court visitor, Superior Court Judge Fred

Torrisi ordered W.A. to submit to a psychiatric examination. Dr. Joanette Sorkin of Alaska Native Medical Center performed the examination on June 9 in Dillingham. Dr. Sorkin found that W.A. had severe deficits with medical decision-making capacity that were "likely precluding his ability to make informed medical decisions regarding his treatment and where he lives." Dr. Sorkin also expressed concern about W.A.'s apparent intoxication during the assessment. She recommended that W.A. undergo neuropsychological testing, preferably after a period of abstinence from intoxicating substances.

On June 14 Dr. Bruce Allen, a psychologist at Kanakanak Hospital, interviewed W.A. after the local chief of police reported that W.A. was trying to entice young girls into his home. Dr. Allen referred W.A. to Alaska Psychiatric Institute (API), and W.A. was admitted there on June 15.

W.A. stayed at API for one month. While at API, W.A. had a neuropsychological screening and diagnostic interview with Dr. David Sperbeck. Dr. Sperbeck reported that W.A. exhibited delusional beliefs and eccentric, overly verbal, and overtly paranoid behaviors. According to the court visitor, who spoke with Dr. Sperbeck, the doctor "strongly supports appointment of a guardian and conservator for [W.A.]." The court visitor also spoke with W.A.'s psychiatrist at API, Dr. Mark Erickson, and a social worker at API, Anne O'Brien, who both supported the appointment of a guardian. W.A. was discharged from API on July 15 and began staying primarily at Brother Francis Shelter in Anchorage.

The court visitor filed her "Second Status Report" on July 29. She documented W.A.'s experiences at API and his subsequent discharge to Brother Francis Shelter. She concluded, "I believe there is adequate evidence to support the appointment of a guardian and conservator for [W.A.], at least on a temporary basis." The court visitor recommended that the court appoint OPA as guardian and conservator for W.A.

On August 5, pursuant to Magistrate Brice's "Third Interim Master's Report," the superior court ordered the appointment of a temporary guardian, finding that the petitioners had shown by clear and convincing evidence that W.A. was in need of the appointment. W.A. stipulated to the appointment of a temporary guardian, but he was not prepared to stipulate to the appointment of a permanent guardian. In the order appointing a temporary guardian, the superior court also scheduled a hearing on permanent guardianship.

The hearing on the petition for a permanent guardian occurred on October 28. At the time of the hearing, W.A. was residing at the Turnagain Assisted Living Home in Anchorage. W.A. indicated at the hearing that he would agree to having a guardian until June 2006. However, much of his testimony throughout the hearing was not coherent and revealed his serious difficulty articulating his thoughts and understanding his circumstances. W.A. testified, "I'm capable of handling my own financial needs." However, he did not know the cost of staying at the assisted living home where he was living. When pressed on how he would pay to continue staying at the assisted living home, he was unable to provide a coherent answer. When W.A.'s own attorney asked him what he would do with the money if he received a permanent fund dividend, W.A. was incapable of answering, instead focusing on the fact that he "cannot get a permanent fund dividend check." He also testified that he is capable of making decisions about his medical care. He discussed treatment he received for a broken arm, but much of his testimony about his arm was confusing and vague, and he was unable to answer questions about whether he went to the hospital immediately after injuring his arm. W.A. also testified, "I'm capable of making my own mental health decisions," but he appeared unable to elaborate on the issue.

Gladys L. and the court visitor also testified at the October 28 hearing. Gladys L. testified that W.A. has "never had a checking account." She also testified that whenever W.A. receives his Bristol Bay Native Corporation checks her mother comes to live with her because W.A. goes to the liquor store and comes back to the house to drink. She stated that "he has never purchased any of his ... personal items" and that the family

purchases things like deodorant, toothbrushes, and toothpaste for him. The court visitor indicated that after reviewing W.A.'s records and interviewing W.A., she did not believe he could make medical decisions for himself. She also testified that he "doesn't seek out mental health care" and that he would not "be capable of managing his finances in a responsible fashion."

On June 4, 2006, Magistrate Brice submitted a master's report regarding permanent guardianship. In the report he stated, "[W.A.]'s history indicates that he lacks the ability to make rational financial, medical or mental health decisions. Many of his past decisions have been against his best interest and have had extremely adverse results." He concluded, "[a] guardianship order should issue and a guardianship plan should be presented to the court giving the guardian authority to make decisions regarding [W.A.]'s medical care, mental health care, housing and financial decisions. It should provide an allowance in an amount to be determined by the guardian for small expenditures determined by [W.A.]."

On March 15, 2007, the superior court issued its final order for appointment of a permanent guardian and a guardianship plan. The court found that W.A. is incapacitated, that alternatives to guardianship and conservatorship are not feasible, and that appointment of a guardian and conservator is necessary to provide for W.A.'s needs. The guardianship plan gave the guardian, Crystal Smith of OPA, "full authority" to provide for W.A.'s medical care, mental health treatment, housing, and personal care, and "full control" of W.A.'s estate and income to pay for the costs of services for W.A. However, the plan also provided that the guardian "will encourage [W.A.] to participate in all decisions that affect [him] and to act on [his] own behalf to the maximum exten[t] possible."

W.A. appeals.

## III.  STANDARD OF REVIEW

■ We review the superior court's factual findings—including a finding of incapacity—for clear error, which we find only "when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[3] The decision to appoint a guardian for an incapacitated person is committed to the sound discretion of the superior court and is reviewed for abuse of discretion.[4] We will find an abuse of discretion if the superior court "considers improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors."[5]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Err in Finding That W.A. is Incapacitated.

■ W.A. challenges the superior court's finding that he was incapacitated. Specifically, W.A. alleges that the expert physician and court visitor could not tell whether W.A.'s behavior was the result of incapacity or choice; that W.A. "passed" the mini-competency exam administered to him in February 2005; and that Dr. Powers, the court visitor and Magistrate Brice could not find that the statutory criteria for appointment of a temporary guardian were met.

Gladys L. argues that "[t]here was sufficient evidence to support the Superior Court's finding that W.A. was ... incapacitated." She alleges that qualified professionals "continuously found that W.A.[ ] was unable to make rational decision[s]."

■ Alaska Statute 13.26.113 governs appointment of a guardian. Alaska Statute 13.26.113(b) states, "[t]he burden of proof by clear and convincing evidence is upon the petitioner, and a determination of incapacity shall be made before consideration of proper disposition." Thus, the clear and convincing evidentiary standard applies to the capacity determination.[6] An "incapacitated person" is

---

**3.**  *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004).

**4.**  *See H.C.S. v. Cmty. Advocacy Project of Alaska, Inc.*, 42 P.3d 1093, 1096 (Alaska 2002).

**5.**  *Id.*

**6.**  *In the Matter of O.S.D.*, 672 P.2d 1304, 1305 (Alaska 1983).

"a person whose ability to receive and evaluate information or to communicate decisions is impaired for reasons other than minority to the extent that the person lacks the ability to provide the essential requirements for the person's physical health or safety without court-ordered assistance."[7] "[E]ssential requirements for physical health or safety" are defined by statute as "the health care, food, shelter, clothing, personal hygiene, and protection without which serious physical injury or illness is more likely than not to occur."[8]

The evidence presented by the court visitor, expert medical professionals, and members of W.A.'s family reveals that W.A. lacks the ability to provide the essential requirements for his physical health or safety. Gladys L. testified that W.A. has never had a bank account and that his family has always provided him with a place to live, paid for his food, and supplied him with personal belongings. She explained that the little money he has received from Bristol Bay Native Corporation has been spent on alcohol. The court visitor testified that she had not seen any evidence of W.A. making rational medical decisions for himself, that he does not recognize his mental health problems, and that he would not be "capable of managing his finances in a responsible fashion." Dr. Sorkin, a psychiatrist, stated that W.A.'s severe deficits with medical decision-making have likely precluded him from making informed medical decisions. Dr. Sperbeck reported on W.A.'s delusional beliefs and overtly paranoid behaviors and strongly supported appointment of a guardian for W.A. W.A.'s psychiatrist at API and his API social worker also supported the appointment of a guardian. The conclusions of these medical and mental health professionals, the court visitor, and W.A.'s family members provide sufficient support for the superior court's conclusion that there was clear and convincing evidence of W.A.'s incapacity.

W.A.'s arguments to the contrary are largely based on testimony presented at the first hearing for appointment of a temporary guardian, before much of the information about W.A.'s condition was determined through interviews and psychological evaluations. For example, W.A. states that the court expert physician and court visitor "could not tell whether W.A.'s behavior and choice of lifestyle was the result of incapacity or choice." However, that statement must be put into context. What the expert and visitor actually explained was that such a determination could not be definitively made without a neuropsychological examination. Thereafter, a neuropsychological examination was conducted by Dr. Sperbeck, and as a result, both he and the visitor supported appointment of a guardian. W.A. also argues that he "passed" the mini-competency exam administered by the court visitor in February 2005. However, the court visitor testified that W.A. was unable to complete a simple math problem, that he was unable to say where he was born or provide relevant information about his life before 1979, and that he had general difficulty with memory. Finally, W.A. argues that Dr. Powers, the court visitor, and Magistrate Brice could not find that the statutory criteria for appointment of a temporary guardian were met. However, Dr. Powers originally recommended that "he get a temporary guardian," and after further interviews and medical examinations, both the court visitor and Magistrate Brice concluded that a temporary guardian should be appointed, and they subsequently concluded that a permanent guardian was appropriate.

Thus, the superior court's finding that there was clear and convincing evidence of incapacity was not clearly erroneous.

**B. The Superior Court Did Not Err in Finding That Alternatives to Guardianship Are Not Feasible.**

██ Part of W.A.'s statement of the issue presented for review argues that the evidence was insufficient to find that "a combination of alternatives to guardianship and the appointment of a partial guardian was not feasible or adequate to meet the needs of respondent." Gladys L. responds that "[d]ue to his complete inability to care for himself with any degree of autonomy, there are no

---

**7.** AS 13.26.005(5).

**8.** AS 13.26.005(2).

less restrictive means available than a full-time guardian."

W.A. fails to present any potential alternatives to guardianship that may be feasible and does not substantively address the issue of guardianship alternatives or partial guardianship. Rather, he simply quotes the language of AS 13.26.113. Thus, W.A.'s argument on this issue is waived.[9] Even if W.A. had not waived the argument, however, it would still be without merit.

The guardianship provisions direct the court to determine whether alternatives to full guardianship are feasible. According to AS 13.26.113(c)-(f),

> (c) If the respondent is found to be incapacitated, the court shall determine the extent of the incapacity and the feasibility of alternatives to guardianship to meet the needs of the respondent.
>
> (d) If it is found that the alternatives to guardianship are feasible and adequate to meet the needs of the respondent, the court may dismiss the action and order an alternative form of protection.
>
> (e) If it is found that the respondent is able to perform some, but not all, of the functions necessary to care for the respondent, and alternatives to guardianship are not feasible or adequate to provide for the needs of the respondent, the court may appoint a partial guardian, but may not appoint a full guardian.
>
> (f) If it is found that the respondent is totally without capacity to care for the respondent and that a combination of alternatives to guardianship and the appointment of a partial guardian is not feasible or adequate to meet the needs of the respondent, the court may appoint a full guardian.

In *In the Matter of O.S.D.*, we held that "the clear and convincing evidence standard stated in section 113(b) applies to any determination which may lead to the imposition of guardianship," including "the determination of whether there existed adequate alternatives to full guardianship."[10] Because "it was unclear whether the master applied the [clear and convincing] standard to the determination of whether there existed adequate alternatives to full guardianship," we remanded "for a determination of what standard of proof was applied below."[11]

Although the superior court's final order in the present case did not explicitly state that it found by clear and convincing evidence that there are no adequate alternatives, the order did explicitly state that "[a]lternatives to guardianship and conservatorship have been considered and are not feasible." The court's statement about feasible alternatives immediately follows its statement that the respondent has been shown to be incapacitated by clear and convincing evidence, indicating that the court believed both findings were supported by clear and convincing evidence. The court also explained that it had fully "accept[ed] Magistrate Brice's recommendation." Magistrate Brice's recommendation stated, "[b]ased on the testimony and various medical, mental health and visitor reports, I am satisfied that the evidence is clear and convincing that [W.A.] is incapable of making financial, medical, and mental health decisions and is in need of a permanent guardian." Because Magistrate Brice found by clear and convincing evidence that W.A. is in need of a permanent guardian—and thus that alternatives to guardianship are not feasible—the superior court's acceptance of Magistrate Brice's recommendation reveals that the superior court also believed that clear and convincing evidence showed a lack of feasible alternatives to guardianship.

The superior court's conclusion that there are no adequate alternatives to full guardianship is amply supported by the evidence in the record, which reveals W.A.'s inability to make rational decisions regarding his medical care, mental health, finances, and even daily living. Thus, the superior court's finding that alternatives to guardianship are not feasible was not clearly erroneous.

---

9. *See Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991) ("where a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal").

10. 672 P.2d at 1306.

11. *Id.*

## V. CONCLUSION

Because the superior court did not err in finding that there was clear and convincing evidence that W.A. is incapacitated and that no feasible alternatives to full guardianship exist, we AFFIRM the decision of the superior court.

EASTAUGH, Justice, not participating.