NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Protective Proceedings of | ) ) ) | Supreme Court No. S-13988 |
| FREDDY A. | ) ) | Superior Court No. 4FA-07-00610 PR |
| | ) ) ) | MEMORANDUM OPINION AND JUDGMENT* |
| _____ | ) ) | No. 1415 – March 28, 2012 |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Robert B. Downes, Judge.

Appearances: Mia A., pro se, Fairbanks, Appellant. Susan M. Carney, Assistant Public Advocate, Fairbanks, and Richard Allen, Public Advocate, Anchorage, for Appellee State of Alaska, Office of Public Advocacy.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices. [Christen, Justice, not participating.]

## I. INTRODUCTION

A mother filed a petition for appointment of a guardian with powers of conservatorship over her developmentally disabled adult son. Her petition nominated the Office of Public Advocacy (OPA) as both guardian and conservator. The superior court appointed OPA to serve as the son's full guardian with powers of conservatorship.

---

\*      Entered pursuant to Alaska Appellate Rule 214.

Later the mother filed a petition to review the guardianship over her son. The superior court denied the petition, and, when the mother sought the appointment of counsel for an appeal, the court also denied that request. Because the mother's petition for review did not demonstrate a material change in circumstances, and because the mother was not entitled to appointment of court-appointed counsel on appeal, we affirm the decision of the superior court in all respects.

## II. FACTS AND PROCEEDINGS

Mia A. is Freddy A.'s mother.[1] Freddy is a 26-year-old individual who is developmentally disabled. Freddy was diagnosed with Fragile X Syndrome on December 11, 1997. Fragile X Syndrome is the most common form of inherited mental retardation. Freddy also exhibits echolalia.[2] As a result of his disabilities, Freddy is "permanently mentally impaired" and unable to make appropriate decisions regarding housing, medical, and financial matters. It is difficult to obtain his opinion on personal matters. He functions at roughly the ability of a four- to eight-year-old individual. Freddy currently lives in group housing supported by the Fairbanks Resource Agency.

In November 2007, Mia filed a Petition for Appointment of a Guardian and Conservator for an Adult over Freddy. The petition nominated OPA as both guardian and conservator. During two days in February and March 2008, the superior court held a long-term guardianship and conservator hearing. The guardianship was uncontested, and the court appointed OPA as full guardian with powers of conservatorship over Freddy. OPA accepted this appointment on March 10, 2008.

---

[1] Pseudonyms have been used for all family members to protect their privacy.

[2] Echolalia is defined in the court visitor's report as "the repetition of vocalizations made by another person."

On April 30, 2008, the court conducted a review hearing after Mia informed OPA of her intent to travel with Freddy to the Philippines. At the hearing, OPA expressed concerns that Freddy would lose his benefits if he remained out of the country for 30 days, that Freddy would lose his job if he left the country, that Mia would use Freddy's public assistance funds to purchase plane tickets for the family, that purchasing plane tickets would affect Mia's ability to pay her mortgage, and that Freddy might not return from the Philippines. During the hearing, Mia requested that the court remove OPA as guardian, which the court denied. At the end of the hearing, the court referred the parties to mediation to work out a solution regarding future travel plans. They were successful, and on May 1, 2008, the parties entered into a mediation agreement providing that Freddy would stay with his uncle in Fairbanks while Mia traveled to the Philippines.[3] The agreement also specified that if Mia ever planned to take Freddy out of Alaska, she would provide OPA at least 90 days' notice and coordinate the trip with OPA.

Hoping to bring Freddy with her to the Philippines a year later, Mia filed a Petition for Review of Guardianship and Conservatorship in May 2009. In July 2009, the court held a guardianship and conservatorship review hearing. At the hearing, the court denied Mia's request for a mediation referral to address the previously entered mediation agreement and scheduled a contested hearing to review whether the guardianship should be modified.

---

[3] Mia never actually traveled to the Philippines in 2008. She attempted to travel there with Melissa, Freddy's sister. But, according to the testimony of Freddy's guardian, "after three days of going through many airports and missing many flights and never being able to make the trip because of her [mental] instability, [Mia] was escorted out of the Fairbanks airport back to her home."

The contested review hearing was held in November 2009. Mia did not appear. The court did not modify the guardianship. At the hearing, the parties brought to the court's attention the fact that Mia continued to seek mediation and review on the same issue: whether she could take Freddy with her to the Philippines. The court stated that, rather than automatically scheduling a review hearing in the future, the parties would first "be given an opportunity to be heard as to whether new issues are before the court or whether the issues to be considered for review were previously resolved in this case."

In June 2010, Mia filed both a Request for Court Sponsored Guardianship Mediation and a Petition for Review of Guardianship and Conservatorship (2010 petition for review). In support of her request for mediation, Mia cited the following issue of concern: "Request for going on vacation in the Philippines on September 17 [through] October 15, 2010." Regarding the review petition, Mia stated the following: "I [Mia A.], biological mother, need (want) to be the legal full guardian of my son [Freddy A.]." Contending that Mia had not offered "new facts on which meaningful review can be held," OPA and the court visitor each filed an opposition. In July 2010, the superior court denied Mia's petition for review, stating that "[Mia A.] has not shown a substantial change in circumstances."

In August 2010 Mia appealed the superior court's denial of a review hearing. She then filed a Request for Appointed Counsel. We remanded the case with instructions to the superior court to "address [Mia's] request for the appointment of counsel to represent [Mia] in further proceedings in this court." In December 2010, the superior court held a hearing on this matter and denied Mia's request. Mia also appeals the denial of her request for counsel.

## III. STANDARD OF REVIEW

The "initial selection of a guardian or conservator for an incapacitated person is committed to the sound discretion of the superior court" and will be reversed only if the superior court abused its discretion.[4] We review an order denying or granting a request to remove a guardian or conservator under the same abuse of discretion standard.[5] We will find an abuse of discretion if the superior court considers improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors.[6]

"The decision of whether to appoint counsel requires examination of the petitioner's rights under the due process clause. Such constitutional questions are questions of law, which [we] review[] de novo."[7] We will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[8]

---

[4]   *In re Protective Proceedings of W.A.*, 193 P.3d 743, 748 (Alaska 2008); *H.C.S. v. Cmty. Advocacy Project of Alaska, Inc.*, 42 P.3d 1093, 1096 (Alaska 2002) (citing *In re Estate of Romberg*, 942 S.W.2d 417, 419 (Mo. App. 1997)); *see also* 39 AM.JUR.2D *Guardian and Ward* § 38 (2011) ("The selection of a guardian is a matter committed largely to the discretion of the appointing court, whose decision will only be interfered with on appeal in the case of an abuse of discretion.").

[5]   *H.C.S.*, 42 P.3d at 1096; *S.N.E. v. R.L.B.*, 699 P.2d 875, 878 (Alaska 1985) (reviewing modification of child custody order under abuse of discretion standard).

[6]   *H.C.S.*, 42 P.3d at 1096.

[7]   *Preston v. Preston*, Mem. Op. & J. No. 5504, 1994 WL 16459442, at *2 (Alaska, Nov. 23, 1994) (citing *In re K.L.J.*, 813 P.2d 276, 278 & n.1 (Alaska 1991)).

[8]   *In re K.L.J.*, 813 P.2d 276, 279 (Alaska 1991) (internal quotation marks omitted) (quoting *Langdon v. Champion*, 745 P.2d 1371, 1372 n.2 (Alaska 1987)).

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion When It Denied Mia's 2010 Petition For Review.

Mia appeals the superior court's July 2010 order denying her 2010 petition for review.[9] OPA contends that Mia "has not shown a substantial change in circumstances" and is not entitled to a modification.

Removal of guardians is governed by AS 13.26.125. Alaska Statute 13.26.125(a) provides that "[o]n petition of the ward, the guardian, or any person interested in the ward's welfare, or on the court's own motion, the court may . . . (B) remove a guardian and appoint a successor; or (C) terminate the guardianship." Alaska Statute 13.26.125 does not specify a procedure for seeking removal of a guardian, nor do the Alaska Probate Rules provide for such a procedure.[10]

We have recognized that, in certain circumstances, modifications of guardianships are proper. In *H.C.S. v. Community Advocacy Project of Alaska, Inc.*,[11] we stated that "initial appointment [of a professional guardian] should not altogether foreclose qualified family members from later asking the court to appoint them in place of the professional."[12] We also have recognized that litigation regarding guardians "can be contentious and can disrupt family relationships already strained by the ward's

---

[9]     Mia's motion is titled Petition for Review of Guardianship and Conservatorship. But in the body of the petition, Mia requests only modification of the guardianship. She makes no request regarding the conservatorship.

[10]     *See* Alaska R. Prob. P. 16, 17. However, Probate Rule 14 does lay out the guidelines for reviewing protective proceedings, i.e. reviewing whether the guardianship is still in the ward's best interests.

[11]     42 P.3d 1093 (Alaska 2002).

[12]     *Id.* at 1099.

circumstances. Extended or repeated litigation over removal is costly both emotionally and financially."[13]

Recognizing these competing interests, we have held that a petitioner seeking to modify a guardianship "must first show that the circumstances of the ward, guardian, or conservator have changed materially since the guardian or conservator was appointed."[14] Once the petitioner demonstrates changed circumstances, the trial court must decide whether the existing appointment is in the ward's best interests.[15] In considering the best interests of the ward, a trial court must consider, among other facts and circumstances, the closeness of the ward's relationships to the existing and prospective guardians, as well as the length and quality of existing appointments.[16]

Mia's 2010 petition for review states only the following: "I [Mia A.], biological mother, need (want) to be the legal full guardian of my son [Freddy A.]." Mia's petition does not state what circumstances, if any, have changed since her 2009 petition for review, in which the trial court found that it was in Freddy's best interests to retain OPA as guardian. Nor does the 2010 petition for review state why having OPA as Freddy's guardian is not in Freddy's best interests.

With no indication by Mia of what, if any, circumstances have changed, we conclude that the superior court did not abuse its discretion when it denied Mia's 2010 petition for review.

---

[13]    *Id.*

[14]    *Id.*

[15]    *Id.*

[16]    *Id.* at 1099-1100.

**B.** **The Superior Court Did Not Err When It Denied Mia Court-Appointed Counsel On Appeal.**

Mia appeals the superior court's December 13, 2010 denial of her request for appointment of counsel on appeal. Alaska Administrative Rule 12(a) provides that "[t]he court shall appoint counsel . . . only when the court specifically determines that the appointment is clearly authorized by law or rule, and that the person for whom the appointment is made is financially eligible for an appointment at public expense."[17] Thus, Mia is entitled to counsel only if it is "clearly authorized by law or rule."

**1.** **Statutory basis for appointment of legal representation**

Alaska Statute 44.21.410 provides for instances under which OPA must provide legal representation.[18] If Freddy were a minor, there would be little question that Mia is entitled to appointed counsel.[19] But Freddy is an adult, and none of the other subsections of AS 44.21.410 applies to Mia. Because there is no other Alaska statute under which a court must appoint counsel for Mia, she is entitled to counsel only if required by the United States or Alaska Constitutions.

**2.** **Constitutional basis for appointment of legal representation**

Mia is entitled to appointed counsel if counsel is guaranteed under the due process clauses of the United States or Alaska Constitutions. The Fourteenth Amendment of the United States Constitution provides that "[n]o State shall . . . deprive

---

[17]    Alaska Admin. R. 12(a).

[18]    AS 44.21.410; *see also* Alaska Admin. R. 12(c)(1) (Appointments under AS 44.21.410).

[19]    AS 44.21.410(a)(10) requires that OPA "provide legal representation to an indigent parent of a child with a disability." *See also* AS 14.30.350 (defining "child with a disability").

any person of life, liberty, or property, without due process of law."[20]  The Alaska due process clause provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law."[21]  We have "repeatedly stated that what procedural due process may require under any particular set of circumstances depends on the nature of the governmental function involved and the private interest affected by the governmental action."[22]  "Due process is flexible, and the concept should be applied in a manner which is appropriate in the terms of the nature of the proceeding."[23]  "The crux of due process is opportunity to be heard and the right to adequately represent one's interests."[24]

In determining what process is due, we have adopted the three-factor test as laid out by the United States Supreme Court in *Mathews v. Eldridge*:[25]

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional

---

[20]    U.S. CONST. amend. XIV, § 1.

[21]    Alaska Const. art. I, § 7.

[22]    *In re K.L.J.*, 813 P.2d 276, 278 (Alaska 1991) (internal quotation marks omitted) (quoting *Arctic Structures, Inc. v. Wedmore*, 605 P.2d 426, 436 (Alaska 1979)). *See also Keyes v. Humana Hosp. Alaska, Inc.*, 750 P.2d 343, 352 (Alaska 1988).

[23]    *Flores v. Flores*, 598 P.2d 893, 895 (Alaska 1979) (internal quotation marks omitted) (quoting *Otton v. Zaborac*, 525 P.2d 537, 539 (Alaska 1974)); *see also In re K.L.J.*, 813 P.2d at 278.

[24]    *In re K.L.J.*, 813 P.2d at 279 (internal quotation marks omitted) (quoting *Matanuska Maid, Inc. v. State*, 620 P.2d 182, 192 (Alaska 1980)).

[25]    424 U.S. 319 (1976), adopted for analysis of Alaska due process clause in *City of Homer v. State, Dep't of Natural Res.*, 566 P.2d 1314, 1319 (Alaska 1977).

or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[26]

We have consistently held that the right to direct the upbringing of one's child is "one of the most basic of all civil liberties."[27] "The right to the care, custody, companionship, and control of one's children undeniably warrants deference and, absent a powerful countervailing interest, protection."[28] Accordingly, Mia has a private interest in Freddy's continued upbringing. But Mia's interest in this case is less than the interests that we have considered in other cases where we found a right to court-appointed counsel, such as *K.L.J.* and *Flores*.[29] Unlike the present case, both *K.L.J.* and *Flores* involved minor children.[30] In the present case, Freddy is no longer a minor child — he is a 26-year-old adult. Mia's parental interest subsided when Freddy turned 18 and

---

[26]    *Id.* at 335.

[27]    *Flores*, 598 P.2d at 895.

[28]    *In re K.L.J.*, 813 P.2d at 279 (internal quotation marks omitted) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)).

[29]    In *In re K.L.J.*, a biological father contested the termination of his parental rights to his minor child as part of an adoption proceeding by the child's stepfather. We held that the superior court's denial of the biological father's request for court-appointed counsel violated his procedural due process rights under the Alaska Constitution. *In re K.L.J.*, 813 P.2d at 276. In *Flores*, we held that the superior court's denial of a wife's request for court-appointed counsel, in a private child custody proceeding in which her spouse was represented by counsel provided by a public agency, violated her procedural due process rights under the Alaska Constitution. *Flores*, 598 P.2d at 893.

[30]    *In re K.L.J.*, 813 P.2d at 277; *Flores*, 598 P.2d at 894.

became an adult under the law.[31] Second, in both *K.L.J.* and *Flores*, we found that the parent was confronted with an effective termination of his or her parental rights.[32] In the present case, Mia is confronted with no such deprivation.[33] Her parental rights terminated when Freddy became an adult.

Moreover, Freddy's private interest in the present case underscores Mia's diminished private interest. The guardianship statutes indicate in several places that the promotion of the developmentally disabled individual's interests is the central focus of guardianship proceedings.[34] Alaska Statute 13.26.090, titled "Purpose and basis for

---

[31]    AS 25.20.010.

[32]    In *K.L.J.*, the biological father's parental rights would have been terminated in the adoption proceeding. *In re K.L.J.*, 813 P.2d 279. In *Flores*, we noted that, although the divorce proceeding would "not sever all parental rights of the petitioner, an award of custody to the respondent [would] have the same consequences, due to the distance between California and Alaska and the petitioner's indigency." *Flores*, 598 P.2d at 895 n.8.

[33]    *Cf. Hamilton v. Hamilton*, Mem. Op. & J. No. 5331, 1994 WL 16459407, at *3 (Alaska, March 9, 1994) (holding that an indigent litigant is not entitled to court-appointed counsel where the issue does not concern termination of parental rights but rather solely the extent of that individual's visitation with his or her minor child). Although *Hamilton* is an unpublished memorandum decision, we cite to it for its persuasive value. *See Hallam v. Holland Am. Line, Inc.*, 180 P.3d 955, 959 (Alaska 2008) (citing unpublished authority and noting that "[u]npublished decisions may still have persuasive value"); *see also McCoy v. State*, 80 P.3d 757 (Alaska App. 2002) ("although Appellate Rule 214 forbids citation of unpublished decisions as precedent . . . the rule does not forbid judges and lawyers from relying on unpublished decisions for whatever persuasive power those decisions might have); Alaska R. App. P. 214(d).

[34]    *See, e.g.*, AS 13.26.116(c) ("The guardianship plan shall be designed to encourage a ward to participate in all decisions that affect the ward and to act on the ward's own behalf to the maximum extent possible."); AS 13.26.117 ("The primary goal of the program described in the report must be, to the maximum extent possible, to

(continued...)

guardianship" states that "[g]uardianship for an incapacitated person . . . shall be designed to encourage the development of maximum self-reliance and independence of the person." Similarly, we have noted that "guardians for incapacitated persons are appointed to promote and protect the well-being of the [incapacitated] person."[35] Even though she is Freddy's mother, Mia's interests are not to be considered in choosing a guardian.[36] As the incapacitated adult, Freddy's interests, not his mother's, are paramount in the guardianship proceedings.[37]

Next, we examine the state's interest. As noted above, Alaska guardianship statutes represent the legislature's intent to focus on the ward's best interests. Traditionally, states have exercised their *parens patriae* authority over incapacitated individuals, recognizing the important role that states play in the care of developmentally disabled adults.[38] Because adult developmentally disabled individuals are no longer

---

[34] (...continued) develop or regain the ward's abilities to handle the ward's own affairs.").

[35] *H.C.S. v. Cmty. Advocacy Project of Alaska, Inc.*, 42 P.3d 1093, 1099 (Alaska 2002) (internal citations omitted).

[36] AS 13.26.113(g), (h).

[37] The focus on Freddy is justified, moreover, because of the substantial effect that an appointment of a guardian has on Freddy's individual liberties. The effect of an appointment of a guardian on Freddy's individual rights is substantial, and thus Freddy has a great private interest in who is chosen as guardian. As a consequence of the guardianship, for example, Freddy no longer has the right to decide where to live, to choose where and when to seek medical care, or to manage his estate and income. Because Freddy's private interests are so high, a guardian ad litem was appointed to represent Freddy's interests.

[38] *See, e.g.*, Joan L. O'Sullivan, *Role of the Attorney for the Alleged Incapacitated Person*, 31 STETSON L. REV 687, 689-92 (2002) (providing overview of (continued...)

children in the eyes of the law, and because their parents are not automatically appointed their guardian, the state has a legitimate interest in providing for the best interests of incapacitated persons.[39]

This examination of the respective interests involved allows us to truncate the *Matthews* analysis. Because the private interest at stake here — a parent's desire to direct the affairs of her adult child — is so low in comparison with the adult child's interests (in the development of "maximum self-reliance and independence of the person") and the state's interest (in providing for the incapacitated person's best interests), we conclude that Mia was not entitled to court-appointed counsel on appeal. The focus of a guardianship proceeding is rightfully on the incapacitated person. Any private interest Mia has in the proceedings is outweighed by Freddy's private interest and the interest of the state in providing for a ward such as Freddy.

## V. CONCLUSION

Because Mia's petition to review the appointment of OPA did not show a material change in circumstances, we AFFIRM the superior court's decision to deny the petition. Because Mia was not entitled to the appointment of counsel on appeal, we AFFIRM the superior court's decision declining to appoint counsel.

---

[38]    (...continued)
history of guardianship).

[39]    We note as well that the state has a "legitimate interest in avoiding the cost of appointed counsel and its consequent lengthening of judicial procedures." *In re K.L.J.*, 813 P.2d 276, 280 (Alaska 1991). This interest is less important than the interest in providing for the well-being of developmentally disabled individuals.