*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KELLEY K. GRIFFIN, | ) | |
| | ) | Supreme Court No. S-14594 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-10-02678 CI |
| v. | ) | |
| | ) | O P I N I O N |
| MICHAEL A. WEBER, | ) | |
| | ) | No. 6760 – March 22, 2013 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Richard Deuser, Law Office of Richard Deuser, Wasilla, for Appellant. No appearance by Appellee.

Before: Fabe, Chief Justice, Carpeneti, and Stowers, Justices, and Matthews, Senior Justice.[*] [Winfree, Justice, not participating.]

MATTHEWS, Senior Justice.

## I. INTRODUCTION

The main question presented is whether a deed that was absolute on its face should have been reformed into a security agreement. We conclude that reformation

---

[*] Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

should have been granted because both parties to the transaction testified that the deed was executed for security purposes.

## II. FACTS

Kelley Griffin owns 25 acres of land near Wasilla. The land is improved with a house and a cabin. Griffin lives in the house. Weber lived in the cabin from 2005 until sometime after he filed suit against Griffin in September 2010. Griffin and Weber were romantically involved in 2003, but that aspect of their relationship had ended by 2005.

Beginning in 2005 Weber paid Griffin rent of $400 per month for the cabin. In 2009 he bought a used truck equipped to carry a dog team for Griffin and made payments on the truck loan of $400 per month in lieu of rent. The truck loan was paid off in June 2010. Griffin is a professional dog musher and a distributor of dog food. In 2008 she was indebted to Blackwood, a dog food manufacturer, and Blackwood had brought suit against her. She was also indebted to Weber for a series of small loans separate from the truck loan. Griffin planned to refinance her property in order to pay off these debts. When it became apparent that she could not personally qualify for the refinancing, she asked Weber to cosign the refinancing note. He agreed to do so.

In January 2009 Griffin and Weber submitted a loan application to Key Bank. Key Bank responded with a commitment letter for a loan, conditioned on the property being titled to both Griffin and Weber. The appraisal obtained in connection with the commitment estimated the value of the property to be $325,000. On January 27, 2009, Weber granted Griffin a power of attorney concerning the property. He worked on the North Slope for long periods of time, and the parties believed the power of attorney might be useful in expediting the refinancing. Key Bank, as it turned out, decided not to refinance the property. Griffin and Weber then applied for a similar loan

from the Matanuska Valley Federal Credit Union. The credit union agreed to make the loan.

On September 22, 2009, Griffin signed a quitclaim deed of her property, granting it to herself and Weber. On the same day the credit union loaned Griffin and Weber $150,000 in exchange for a promissory note signed by them both, secured by a deed of trust on the property. Griffin used the proceeds of the loan to pay off the existing loan on the property, about $53,000, her debt to Blackwood, and her debt to Weber, which at that point was $22,905.

Monthly payments on the note were $1,200. Griffin made all the payments, with the exception of $400 paid by Weber in July 2010. In an affidavit Weber described this payment as "rent . . . paid in the form of a direct payment on the mortgage on the property." Griffin also paid the taxes and insurance premiums concerning the property.

In July 2010 Griffin sought to refinance the property with her fiancé, Ed Grube. The credit union approved, conditioned on Weber relinquishing his interest in the property. When Weber refused, Griffin signed a quitclaim deed conveying Weber's interest to herself. The deed and an attachment to it indicated that Griffin was signing Weber's name under the power of attorney granted in January 2009. The credit union refused to proceed with the new refinancing based on this deed.

## III.   PROCEEDINGS

On September 14, 2010, Weber filed a complaint against Griffin in the superior court in Palmer. He claimed that Griffin's act of signing the quitclaim deed under the January 2009 power of attorney was fraudulent, a breach of Griffin's fiduciary duty and her duty of good faith and fair dealing, and a conversion. He sought compensatory and punitive damages, a declaration that the deed signed by Griffin was void, and partition of the property as a one-half owner. Griffin answered, denying that the execution of the deed under the power of attorney was wrongful, and counterclaimed

for, among other things, reformation of the September 22, 2009 deed into a security instrument and an award of back rent.

After some discovery was conducted both parties moved for summary judgment. Their motions were denied and a trial to the court was conducted beginning August 30, 2011.

## A.    Weber's Testimony

At the trial Weber testified that the refinancing was presented to him by Griffin as a good way for him to receive the money that Griffin owed him. In particular, he stated that the purpose of the September 2009 quitclaim deed "was to secure my interest in the loan should something happen to her." He also stated that Griffin told him that the fact that he appeared on the deed would improve his credit rating. Weber confirmed that the debt Griffin owed him was paid off by the proceeds from the September 2009 refinancing transaction, except for the dog truck transaction.

Weber also testified that Griffin agreed to convey ten acres of the property to him for $40,000 and that he could pay the $40,000 by making payments on the refinancing loan. When Weber testified to the agreement to convey ten acres, Griffin's attorney objected on the ground that this evidence had not been disclosed until the morning of trial. Weber's counsel replied that Weber was not seeking to enforce the agreement regarding the ten acres, but that the agreement was one reason why Weber had refused to deed over his interest in the property when Griffin sought to refinance the property with Grube in July 2010. Weber subsequently confirmed this in his testimony.

## B.    Griffin's Testimony

Griffin testified that her agreement with Weber as to the refinancing of her property was that in exchange for his cosigning the note, part of the proceeds would be used to pay off the loans that he had extended to her. She testified that she promised to pay off the cosigned note as quickly as possible "to let him out from underneath it." She

also indicated that it was discussed that his participation in the transaction would establish a credit rating for him. Griffin testified that Key Bank had required that Weber be added to the title as a condition of refinancing. She stated that Weber would thereby "be secured against any default that I would have making loan payments on this loan." When the credit union took the place of Key Bank in the proposed transaction, she assumed that the credit union would likewise want Weber on the title. Based on this assumption, she executed the September 2009 quitclaim deed.

Griffin testified that Weber suggested that he be allowed to purchase ten acres. She responded that the costs of subdividing her 25-acre parcel and the type of road that would be required in connection with the subdivision would be prohibitively expensive — he could buy ten acres somewhere else for less than it would cost to subdivide her parcel. She testified that she gave a negative answer to his ten-acre proposal because of this.

Griffin testified that she attempted the 2010 refinancing with her fiancé in order to completely pay off the 2009 note with Weber as quickly as possible, as she had promised. She stated that she discussed with Weber several times the need for him to deed his interest in the property back to her in order for the transaction to go through. When Weber refused, Griffin stated that she decided to use the power of attorney he had granted in January 2009 to execute a deed on his behalf; but the credit union would not accept it. Griffin also testified that as of the time of trial, Weber continued to occupy the cabin and had not paid rent since August 2010.

C.    **The Superior Court's Decision**

At the conclusion of the trial the court announced findings of fact and conclusions of law. The court found that Griffin breached her fiduciary duty to Weber by using the power of attorney to sign the quitclaim deed of July 2010 for Weber and ruled that the deed was invalid. The court also found that there was not clear and

convincing evidence that the parties intended the September 2009 deed to be a security device rather than a conveyance under which they would equally share a one-half interest in the property. The court found that Weber did not owe back rent because he was a one-half owner, there was no evidence that would support a compensatory or punitive damage award, and there was insufficient evidence on which to base a partition remedy. The court also noted that there was not sufficient evidence to support finding that there was an agreement to sell Weber ten acres. Upon an inquiry by counsel for Griffin as to whether Weber had an obligation to pay the mortgage, the court's answer was: "He is on the mortgage. So you'll have to move forward under that just like you would if you had property that you would have to divide and you have to figure out how to move forward."

Griffin moved for reconsideration of the court's rulings but her motion was denied and the superior court entered a final judgment. The judgment adopts by reference the court's oral findings and conclusions and awards an equal interest in the property to the parties as tenants in common.

From this judgment, Griffin appeals. She seeks reversal of the judgment and directions to the superior court on remand to order reformation of the September 2009 deed and to adjudicate rent arrearages. Weber has not filed an opposing brief.

## IV.     DISCUSSION

Griffin's primary argument on appeal is that the court erred in refusing to reform the September 2009 deed. She argues that the court committed clear error because both parties agreed that the purpose of the deed was to secure Griffin's obligations to Weber rather than to serve as an absolute conveyance.

The question whether the deed was intended as a security instrument is a question of fact.[1] On appeal, findings of fact by a trial court may not be disturbed unless they are clearly erroneous.[2] Deeds absolute on their face can be reformed into security agreements based on clear and convincing evidence that a security was intended.[3]

Both parties testified in this case that the purpose of the September 2009 deed was to secure Griffin's obligations to Weber. Griffin testified that the deed was to secure her obligation to pay the whole of the note that Griffin cosigned. Weber testified that the purpose of the deed "was to secure my interest in the loan" and suggested that it also was to secure Griffin's promise to sell ten acres to him. But since enforcement of any such obligation was not sought, it was waived. Thus, as matters stand, the only obligation that the deed secures is Griffin's obligation to pay the note to the credit union.

Because both parties testified that the deed was for security purposes, the evidence to that effect was clear and convincing. Thus reformation of the deed should have been ordered. Further, based on the same testimony, we conclude that the superior court's failure to find that the deed was for security was clearly erroneous. Therefore the standard of review for a fact-based judgment has been satisfied, and the judgment entered in this case should be reversed.[4]

---

[1]     *Rizo v. MacBeth*, 398 P.2d 209, 211 (Alaska 1965).

[2]     *In re Protective Proceedings of W.A.*, 193 P.3d 743, 748 (Alaska 2008) (quoting *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004)).

[3]     *Rizo*, 398 P.2d at 211; *see also* RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 3.2 cmts. a, b (1997).

[4]     We have listed a number of circumstances that courts may consider in deciding whether a deed was intended as a security instrument.

The majority rule is that a deed absolute on its face

(continued...)

may be declared to be a security agreement. . . .

> To determine whether an instrument is a deed or a security instrument, the court must look to the intention of the parties at the time of execution. In the absence of any writing the intention is to be determined from all of the facts and circumstances of the transaction in which the deed was executed, in connection with the conduct of the parties after its execution.

> Some of the various circumstances that may be considered are: The adequacy or inadequacy of consideration as compared to the value of the property, which is often stated to be the single most important fact. Retention or nonretention of possession. The conduct of the parties before and after the execution of the instrument. The financial condition of grantor at the time of execution of the instrument. The overall relationship of the parties — financial, business, debtor-creditor, etc. Whether the grantor or grantee paid the taxes. The construction of improvements after the execution of the deed. . . .

> . . . .

> The majority rule is that before a deed absolute on its face can be declared to be a security instrument the court must have found that it was the mutual intent of the parties that the instrument have that effect.

*Rizo*, 398 P.2d at 211-12 (footnotes omitted).

It is not necessary to rely on these factors in this case because of the testimony of the parties as to the purpose of the deed. But it is worth noting that to the extent that these factors apply to the circumstances of this case they indicate that a security rather than a permanent title transfer was intended. As to the consideration factor, for his contingent liability as a cosigner of the $150,000 note, Weber would receive a one-half interest in property valued at $325,000, even if he was never required to pay anything on the note. As to the possession factor, no change in the retention of

(continued...)

Our conclusion that the September 2009 deed should be reformed so that it is a security instrument makes it unnecessary to decide Griffin's argument that the court erred in finding that Griffin breached her fiduciary duty with respect to the power of attorney. The only consequence of that finding was that it supported the superior court's determination that the July 2010 deed was invalid. Without questioning the correctness of this determination, it is moot in light of the reformation of the 2009 deed. Our conclusion concerning the reformation of the 2009 deed also means that Weber may owe Griffin some amount in back rent.

On remand the court should conduct supplemental proceedings as necessary to determine the form and terms of the security instrument that results from the reformation of the 2009 deed and the amount of rent, if any, owed by Weber. Weber also should be instructed to cooperate with any refinancing effort by Griffin that will result in the elimination of his contingent obligation on the note that he cosigned.

## V.    CONCLUSION

The superior court's decision is REVERSED and REMANDED for further proceedings consistent with this opinion.

---

[4](...continued)
possession occurred. As to conduct, Weber continued to pay rent in the form of the truck loan. This is not a strong factor in Griffin's favor, because Weber had personally incurred the obligation on the truck loan before the deed was executed. But the fact that Weber made a $400 payment after the truck loan was paid off that he characterized as rent, points to his continuing status as a tenant. Griffin's financial condition at the time of the transaction was that she needed a loan because she was being sued by a creditor and had other debts. The overall relationship between Griffin and Weber in 2009 was that he was an accommodating friend, as well as a creditor and tenant, but he was not a person, such as a lover or family member, who might be expected to be the recipient of a permanent transfer of a part of Griffin's property. Finally, Griffin paid all the taxes and insurance on the property after the deed was executed.