*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Protective Proceedings of | ) ) ) | Supreme Court No. S-18721 |
| G.J.F. | ) ) | Superior Court No. 3AN-22-02441 PR |
| | ) ) | O P I N I O N |
| | ) ) | No. 7746 – February 14, 2025 |
| | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: Travers Gee, Assistant Public Advocate, Beth Goldstein, Deputy Director, and James Stinson, Public Advocate, Anchorage, for Office of Public Advocacy, Public Guardian Section. Elizabeth D. Friedman, Law Office of Elizabeth D. Friedman, Prineville, Oregon, for G.J.F.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.
CARNEY, Justice, dissenting.

# I. INTRODUCTION

After receiving a referral from a homeless shelter, a nonprofit social services organization provided intensive case management support to a client with intellectual and developmental disabilities. At first the client was resistant to the organization's assistance and "fired" several counselors, but eventually one clinician

was able to establish a consistent therapeutic relationship. The organization helped the client obtain housing and some government benefits, and provided other assistance. But the organization provided services that were above and beyond what it typically offers.

The organization petitioned the superior court to appoint the Public Guardian as a full guardian for the client. The client agreed to a full guardianship, but the Public Guardian objected on the grounds that less restrictive alternatives were feasible and adequate to meet the client's needs. The court determined that less restrictive alternatives could not meet the client's needs, granted the organization's petition for a full guardianship, and appointed the Public Guardian. We affirm the superior court's order appointing the Public Guardian as a full guardian for G.J.F.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

G.J.F.[1] moved to Alaska in 2021 as a young adult. In September G.J.F. was referred by a homeless shelter to Volunteers of America Alaska (VOA), a nonprofit organization that provides social services to young adults, youth, and their families. VOA accepted G.J.F. for counseling services to address their intellectual and developmental disabilities, and helped G.J.F. find housing.

Initially, G.J.F. was not receptive to services and "fired" several VOA case managers and peer support specialists. But VOA's clinical supervisor eventually established a relationship and became G.J.F.'s primary clinician. The clinical supervisor began working with G.J.F. on a weekly basis in December, providing individual counseling and assisting G.J.F. with completing basic tasks like paying bills and buying groceries. VOA also helped G.J.F. apply for a variety of benefits, including

---

[1] We refer to G.J.F. by initials to protect their privacy and use "they/them" pronouns at their request.

food stamps (SNAP benefits); a Medicaid individualized supports waiver;[2] a second, more comprehensive, Medicaid waiver;[3] and Social Security disability benefits.[4]

## B.    Proceedings

In September 2022 VOA's program director filed a petition to appoint the Office of Public Advocacy's (OPA's) Public Guardian as a full guardian for G.J.F.[5] The petition stated that G.J.F. had shown "sign[s] of limitation with decision[-]making" and limited "functionality around many life domains."  The superior court appointed a visitor and scheduled a hearing on the petition before a master in December.[6]  The court visitor interviewed G.J.F., the VOA program director, G.J.F.'s primary clinician (who is also VOA's clinical supervisor), and G.J.F.'s case manager.  The visitor filed her report prior to the December hearing and attached a recent neuropsychological evaluation of G.J.F.[7]

---

**2**     Individuals with certain developmental disabilities may qualify for individualized supports waivers (ISWs), which allow them to receive services beyond the usual limits set by the Medicaid program.  7 Alaska Administrative Code (AAC) 130.206(a)(1).

**3**     Individuals with certain developmental disabilities may also qualify for an intellectual and developmentally disabled (I/DD) waiver, which allows them to receive a wider array of services beyond those covered by an ISW.  *Compare* 7 AAC 130.206(a)(1), *with* 7 AAC 130.206(a)(2) (indicating I/DD waivers cover wider range of services than ISWs).  At the time of the superior court hearing, G.J.F. had applied for but not yet received the I/DD waiver.

**4**     At the time of the hearing, G.J.F. had applied for but not yet received Supplemental Security Income (SSI) benefits.

**5**     *See* AS 13.26.221(a) (enabling "[a]ny person" to petition court to appoint guardian for any person found to lack capacity to manage affairs).

**6**     *See* AS 13.26.226(c) (requiring appointment of court visitor to "arrange for evaluations to be performed and prepare a written report to be filed with the court").

**7**     *See id.* (requiring appointment of "expert who has expertise in regard to the alleged or admitted incapacity to investigate the issue of incapacity").

The neuropsychological evaluation listed several diagnoses for G.J.F.: mild intellectual disability, major depressive disorder, generalized anxiety disorder, and "other specified-trauma and stressor-related disorder." G.J.F. also reported having a dissociative identity disorder with ten "alter egos," many of which "refuse to come out." During the evaluation, G.J.F. "appeared much younger than [their] stated age" and expressed that, at times, they have the "mind of a six-year-old." G.J.F. also had "little awareness of organization or time," "considerable difficulty following instructions," and "significant difficulty remaining on task." The evaluator noted G.J.F.'s "impaired" concentration and stopped one task because G.J.F. was unable to understand directions despite "several repetitions."

The evaluation concluded that G.J.F. had "poor" insight and judgment and scored G.J.F.'s intellectual functioning as "Exceptionally Low." The evaluation also noted that G.J.F. struggled with decision-making and comprehension when "feeling anxious, paranoid, or overwhelmed." The evaluator concluded that G.J.F. "would benefit from guardianship or at the very least a payee" and recommended that G.J.F. "receive any state services and financial assistance" they qualify for.[8]

Following the hearing, the master recommended the appointment of a full guardian for G.J.F., and the Public Guardian filed objections. The superior court rejected the master's recommendations and scheduled an evidentiary hearing for March 2023.

### 1. Superior court hearing

At the superior court hearing, the parties stipulated that G.J.F. was incapacitated and that the Public Guardian would be appointed if the court ordered a

---

[8] The visitor's report similarly noted that G.J.F. needed help with daily living activities; "would benefit from food stamps, adult public assistance, and Medicaid services"; and struggled with decision-making.

guardianship. The parties also agreed to admit the neuropsychological evaluation into evidence without the testimony of an expert.

The court was able to observe G.J.F.'s demeanor at the hearing. When the hearing began, G.J.F.'s attorney advised the court that G.J.F. might need to take breaks because some testimony would be "difficult for [G.J.F.] to hear." And at one point, the attorney asked to pause the hearing so she could escort G.J.F. to the bathroom.

Only two witnesses testified: VOA's program director and its clinical supervisor. The program director testified that VOA typically provides "behavioral health services to young adults, youth, and family," including "case management, therapy, counseling, [and] crisis services." She then discussed her attempts to meet G.J.F.'s needs and the services that VOA was providing. The director testified she had helped G.J.F. move from a homeless shelter into an apartment. She also testified that G.J.F. struggles with day-to-day care and finances, gets taken advantage of by others, and requires additional support to live independently.

The program director confirmed that G.J.F. was working with VOA and had obtained stable housing, but G.J.F. was initially not receptive to VOA's assistance. The director acknowledged that VOA staff were giving G.J.F. some of the assistance that she hoped a guardian would provide. She also confirmed she petitioned for a guardian so that VOA could "work alongside the public guardian" to create "the best situation [for G.J.F.] with services that meet [their] needs." But she testified that VOA could not be a decision-maker for G.J.F. and indicated that G.J.F. needed assistance from someone with decision-making powers.

The clinical supervisor testified next. She explained that G.J.F. required significant assistance with daily living activities, which included helping G.J.F. "get[] groceries, helping them . . . get household goods, pay[ing] their internet and phone bill," and "ensur[ing] that their rent portion is paid." She said the organization had to obtain additional funding to provide G.J.F. with these services, which are "outside of the realm of what [VOA] typically can provide" for other clients.

The clinical supervisor described G.J.F. as "highly vulnerable to online predators." She testified that G.J.F. was particularly vulnerable and struggled with decision-making as a result of short-term memory loss, intellectual disability, and dissociative identity disorder. For example, the supervisor testified that G.J.F. gave away a stipend they had earned through a work program to someone whom they met online. The supervisor explained that VOA's concern about finances was the impetus for petitioning for a guardian, and VOA would work cooperatively with a guardian to make sure all of G.J.F.'s needs were met.

The clinical supervisor testified that although G.J.F. had made "good progress" with VOA, they still struggled "to engage fully" in counseling and could "not typically function" independently in the community or meet their "medical or financial . . . needs." The supervisor testified that VOA serves clients until their 25th birthday, and G.J.F. would remain eligible until then. On cross-examination, she agreed that "there isn't anything other than hitting age 25 which is a limit on the services that are being provided as alternatives to guardianship." However, she then qualified that statement, explaining that because VOA is a grant-funded nonprofit organization and "grants are not guaranteed, there's no way that I can say . . . without any doubt that we're going to continue to be there for [G.J.F.] through the age of 25." The supervisor described how VOA was "expending a lot of our time and resources to work with [G.J.F.] to ensure [their] safety and well-being," but the level of services was "outside of the realm of what we typically do." She further explained that the atypical level of services provided to G.J.F. restricted the resources VOA would otherwise be able to make available to other clients.

After the supervisor testified, the court visitor related her observations to the court. The visitor's report described G.J.F. as "childlike" and "unkept," and the visitor explained during the hearing that G.J.F. had been "unable to have a deep meaningful conversation" about their needs. The report also explained that VOA was helping G.J.F. apply for social security benefits, and G.J.F. "would benefit from

applying for [a]dult public assistance, food stamps, housing assistance, and the Medicaid waiver program." However, the visitor did not testify under oath, and her report was not offered or admitted as evidence.

### 2. Order appointing the Public Guardian

The superior court issued a written order appointing the Public Guardian as G.J.F.'s full guardian. It determined that the testimony at the evidentiary hearing, the visitor's report, and other documentary evidence constituted "clear and convincing evidence [G.J.F.] is incapacitated and a guardian should be appointed."

The court acknowledged testimony explaining that G.J.F. was diagnosed with a number of mental health conditions that profoundly affected their ability to function as an independent adult. It also noted that G.J.F. struggled with decision-making, was vulnerable to predators, and needed various forms of public assistance. Finally, the court noted that VOA's resources were strained and its ability to maintain the level of support it was providing to G.J.F. was uncertain.

The court then made findings under the guardianship statutes. It found that the parties stipulated to G.J.F.'s incapacity and to the Public Guardian's appointment if the court determined that a guardian was necessary. Regarding G.J.F.'s capabilities, the court found that "[w]hile [G.J.F.] can perform some tasks," they were "incredibly vulnerable and subject to predation by others seeking to exploit." Although VOA was providing "some services," the court found that those services were "not typical" and "could cease at any moment," which would leave G.J.F. "vulnerable to predation and ultimate[ly] homelessness." The court concluded that a guardian "would be in a much better position to guard [G.J.F.'s] finances, assist in ensuring [G.J.F.] is receiving all entitled benefits, [and] assist in coordinating proper housing services."

The court noted its obligation to "consider less-restrictive alternatives" and acknowledged its authority to "order a partial guardianship, or implement other forms of relief which may be a less-restrictive alternative to a full guardianship while still protecting a respondent's basic needs." It found that a partial guardianship or less

restrictive alternatives to guardianship were not feasible because G.J.F. required more services than VOA could provide. The court found that G.J.F. needed assistance "with financial decisions, ensuring all financial benefits are applied for and ultimately . . . utilized for [G.J.F.'s] benefit," getting G.J.F. "into a group home setting," and "organizing counseling services," all of which a guardian would be better equipped to do than VOA. Finally, the superior court concluded that appointing a guardian would provide G.J.F. with a "safety net to ensure future services continue without the fear of lack of funding or taxing resources currently being experienced by [VOA]." The court declared that "[t]he receipt of some services provided to the respondent simply cannot be an automatic disqualifier to appointment of a guardian" and appointed OPA's Public Guardian as a full guardian for G.J.F.

The Public Guardian appeals.

## III. STANDARD OF REVIEW

"The decision to appoint a guardian for an incapacitated person is committed to the sound discretion of the superior court and is reviewed for abuse of discretion."[9] There is an abuse of discretion if the superior court "considers improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors."[10] But we review "factual findings involved in determining whether a guardian or conservator should be appointed for clear error."[11] "A finding is clearly erroneous when a review of the entire record leaves us with a definite and firm conviction that the superior court has made a mistake."[12]

---

[9]   *In re Protective Proc. of W.A.*, 193 P.3d 743, 748 (Alaska 2008).

[10]   *Wilson v. State, Dep't of Law*, 355 P.3d 549, 555 (Alaska 2015) (quoting *Farmer v. Farmer*, 230 P.3d 689, 693 (Alaska 2010)).

[11]   *In re Protective Proc. of M.K.*, 278 P.3d 876, 881 (Alaska 2012) (quoting *Gunter v. Kathy-O-Estates*, 87 P.3d 65, 68 (Alaska 2004)).

[12]   *Id.* (alterations omitted) (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 77 P.3d 715, 717 (Alaska 2003)).

## IV. DISCUSSION

The Public Guardian argues that the superior court abused its discretion in appointing a full guardian because it failed to consider whether less restrictive alternatives were feasible and adequate to meet G.J.F.'s needs. Alternatively, it argues that the record "at best" supports imposition of a partial guardianship.

We disagree. The court's findings indicate G.J.F. needed assistance from someone with the decision-making powers of a full guardian, and those findings are supported by the record. The record clearly establishes that support from VOA was inadequate because VOA could not provide the kind of decision-making support that G.J.F. needs. The record also demonstrates that the atypical level of services VOA provided to G.J.F. strained the organization's resources and jeopardized its ability to meet the needs of its other clients. Although the court erred in basing some of its findings on information contained in the visitor's report, the same information was also introduced through evidence properly in the record, so the error is harmless.

We begin with an explanation of the laws pertaining to the appointment of a guardian, including the requirement that there be no less restrictive alternatives that will meet the respondent's needs. We then explain why we hold that the superior court did not abuse its discretion by appointing a full guardian. Finally, we conclude it was error to rely on the visitor's report because it was not admitted into evidence, but the error was harmless.

### A. The Superior Court May Order A Full Guardianship If The Petitioner Establishes That Less Restrictive Alternatives Cannot Meet The Respondent's Needs.

Appointing a full guardian for an individual is a significant intrusion by the government into a person's autonomy. Alaska Statute 13.26.201 recognizes the gravity of this intrusion in noting that guardianship "shall be used only as necessary" and "shall be ordered only to the extent necessitated" by a person's limitations. We have described that language as evincing "a strong policy of restraint" on the part of

state courts.[13]  Because of the extent of the intrusion, the petitioner must prove to the court by clear and convincing evidence that a full guardianship is justified.[14]

When a guardianship petition is filed, the court must hold a hearing before determining whether the respondent is incapacitated.[15]  To assist with this determination, the court must appoint a visitor, who in turn hires an expert to examine the respondent and evaluate the level of the person's incapacity.[16]  "If the respondent stipulates to incapacity, the court may" find "incapacity without obtaining evidence from the expert," but the petitioner still bears the burden to prove incapacity by clear and convincing evidence.[17]

If the court finds the respondent is incapacitated, "the court shall determine the extent of the incapacity and the feasibility of alternatives to guardianship to meet" the respondent's needs.[18]  If the court finds "that alternatives to guardianship are feasible and adequate to meet the needs of the respondent, the court may dismiss the action and order an alternative form of protection."[19]  If the court instead finds "that the respondent is able to perform some, but not all, of the functions necessary to care for the respondent, and alternatives to guardianship are not feasible or adequate to provide for the needs of the respondent, the court may appoint a partial guardian, but

---

[13]     *In re O.S.D.*, 672 P.2d 1304, 1306 (Alaska 1983).

[14]     *See id*. (holding that clear and convincing standard applies to "any determination which may lead to the imposition of guardianship").

[15]     AS 13.26.226(a).

[16]     *See* AS 13.26.226(c) (requiring visitor to "arrange for evaluations" and "for the respondent to be examined by the expert appointed" by court "to investigate the issue of incapacity").

[17]     AS 13.26.251(b).

[18]     AS 13.26.251(c).

[19]     AS 13.26.251(d).

may not appoint a full guardian."[20]  The court may appoint a full guardian only if it finds "that the respondent is totally without capacity to care for the respondent and that a combination of alternatives to guardianship and the appointment of a partial guardian is not feasible or adequate to meet the needs of the respondent."[21]

The relevant statutes suggest a range of alternatives to full guardianship.[22] If an individual is in need of court-ordered intervention, a court may appoint a conservator to manage or protect the individual's money or property.[23]  If the individual requires more than a conservator's intervention, the law requires the court to consider appointment of a partial guardian whose powers must be limited to those necessary to allow the individual to exercise the "maximum self-reliance and independence of the person," and "only to the extent necessitated by the person's actual mental and physical limitations."[24]

## B.    The Superior Court Did Not Abuse Its Discretion By Appointing A Full Guardian.

The Public Guardian argues that the superior court failed to apply the clear and convincing evidence standard in its determination that G.J.F. needed a full guardian.  Consequently, it maintains that the court erred by determining that alternatives to a full guardianship would not meet G.J.F.'s needs because there was evidence of feasible and adequate alternatives.  The Public Guardian argues that where an incapacitated respondent "has, or can obtain, or has access to services and resources outside of a guardianship that meets their needs, that is a disqualifier for a guardianship

---

[20]    AS 13.26.251(e).

[21]    AS 13.26.251(f).

[22]    *See* AS 13.26.251(d) (allowing court to "dismiss the action" if "it is found that alternatives to guardianship are feasible and adequate to meet the needs of the respondent").

[23]    AS 13.26.401(2).

[24]    AS 13.26.201; *see also* AS 13.26.251(e).

appointment to meet those needs." It argues that the court "applied a standard that defaulted to the imposition of a full guardianship unless clear and convincing evidence showed that the services G.J.F. was receiving completely obviated the need for a full guardianship."

Though the court's order could have been more explicit,[25] the order provides a clear indication that the court considered less restrictive alternatives to a full guardianship, including a partial guardianship, and includes a determination that the record contained clear and convincing evidence that those alternatives were not "feasible and adequate" to meet G.J.F.'s needs.[26] The court determined that continuing VOA's atypical level of support was not feasible because those services could "cease at any moment," and it was not an adequate alternative to guardianship because VOA's services did not meet G.J.F.'s needs. Further, the court's order shows it found that G.J.F. requires assistance from someone with the range of powers entrusted to a full guardian. Clear and convincing evidence supports this finding. This finding necessarily implies that the court considered less restrictive alternatives, including a partial guardianship.

---

[25] Although the superior court's findings regarding less restrictive alternatives were not extensive, they need not be, so long as they "give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what considerations were involved." *See In re Protective Proc. of M.K.*, 278 P.3d 876, 885 (Alaska 2012) (quoting *Bird v. Starkey*, 914 P.2d 1246, 1249 (Alaska 1996)). But we emphasize again that both AS 13.26.201 and our precedent recognize the importance of considering less restrictive alternatives in guardianship proceedings. *See In re O.S.D.*, 672 P.2d 1304, 1306 (Alaska 1983).

[26] *See* AS 13.26.251(c)-(d).

**1. The superior court did not clearly err in finding there were no feasible and adequate less restrictive alternatives to a full guardianship.**

The Public Guardian claims that "G.J.F. is capable of meeting some of the functions necessary to care for themselves" if VOA continues to provide "supported decision[-]making." Further, it argues that if the court had meaningfully considered less restrictive alternatives to guardianship, it would have determined that alternatives, including a partial guardianship with continued support from VOA, were feasible and adequate to meet G.J.F.'s needs. The Public Guardian also claims that the court should have explicitly considered ordering a payee or conservator for G.J.F before ordering a guardianship.

The court's findings show that it determined no other alternatives to a full guardianship would be adequate to meet G.J.F.'s needs because none can provide the decision-making support that G.J.F. requires. The court acknowledged that G.J.F. obtained benefits, housing, and basic necessities with VOA's help. But the court also found that G.J.F. needed assistance from someone who could make a wide range of decisions on G.J.F.'s behalf. And given G.J.F.'s history of "simply discontinu[ing] . . . or fir[ing]" VOA employees, the court concluded that a guardianship was the appropriate solution.

The record supports the court's finding that G.J.F. needs decision-making support that alternatives to a full guardianship cannot provide. VOA's program director testified that G.J.F. has "difficulty [with] a lot of life decision[-]making," and indicated that VOA cannot make decisions on G.J.F.'s behalf.[27] Testimony also indicated that G.J.F. struggles to access and protect their financial resources. And although a

---

[27] The superior court's order directly referenced this testimony, and thus "allow[s] us to glean from the record what considerations were involved." *See In re M.K.*, 278 P.3d at 885.

conservator or payee could help manage G.J.F.'s finances, neither can consent to medical care or make other legal decisions.[28]

Further, the superior court considered continued VOA involvement as an alternative to a full guardianship and found that it would be inadequate. It rejected the Public Guardian's argument that supported decision-making is sufficient to meet G.J.F.'s needs because G.J.F. "requires more, which is where a guardian would come into play." It found that unlike VOA, a guardian could "assist[] with financial decisions, ensur[e] all financial benefits are applied for and ultimately . . . utilized for [G.J.F.'s] benefit, work[] to get [G.J.F.] into a group home setting, and assist[] with organizing counseling services."

The extent of VOA's involvement with G.J.F. leading up to the petition supports the court's finding that VOA assistance is not a feasible or adequate alternative to a full guardianship. In *In re Protective Proceedings of W.A.*, the respondent's family had been providing him with housing, food, hygiene items, and personal belongings.[29] This evidence "reveal[ed] W.A.'s inability to make rational decisions regarding . . . daily living" and supported the court's finding that alternatives to guardianship were not feasible.[30] Here, testimony established that VOA helped G.J.F. seek appropriate medical treatment, apply for welfare programs, maintain daily hygiene, and obtain basic necessities. Although these services helped G.J.F. achieve some degree of stability, evidence that G.J.F. progressed because of an intensive and atypical level of assistance from VOA supports the court's finding that G.J.F. "requires more" than VOA is generally equipped to offer. The fact that VOA was understaffed and continuing to add

---

[28]    AS 13.26.500 (conservator's powers); 42 U.S.C. § 1383 (payee's powers).

[29]    193 P.3d 743, 747-49 (Alaska 2008).

[30]    *Id.* at 750; *c.f. id.* at 749 (holding testimony that family provided housing, food, and personal belongings supported court's conclusion that there was clear and convincing evidence of respondent's incapacity).

clients while it diverted a disproportionate share of resources to help G.J.F. supports the superior court's conclusion that VOA was not a viable alternative to a full guardian.

We decline to adopt a precedent that effectively commits nonprofit social service organizations to provide a level of service to a client that is above and beyond what is typical, especially when doing so would risk the organization's ability to provide necessary services to other clients. A determination that continued VOA support is an adequate alternative to guardianship would force VOA to choose between either continuing to provide G.J.F. an atypical level of support or discontinuing services to a level that would leave G.J.F. vulnerable to predation. We will not place VOA in this dilemma.[31]

The court also found that continued VOA involvement was not an adequate alternative to guardianship because VOA's services "could cease at any moment." The court's order suggested this finding was based on testimony that grant funding to support G.J.F. could become unavailable. Tenuous funding, however, was not the only support in the record for the court's finding that the level of VOA's services could end at any point. The court recognized that helping G.J.F. maintain stability required VOA to provide G.J.F. with services that were "above and beyond" the norm and "not typical," and the court specified that *those services* could "cease at any moment."

Testimony describing the challenges VOA faced in working with G.J.F. thus supports a finding that *the level of services* VOA was providing "could cease at any moment." VOA's clinical supervisor testified that VOA's services to G.J.F. were "outside of the realm" of what it provided to other clients, and VOA does not have

---

[31]    *Cf. id.* at 750 (affirming finding that no least restrictive alternative to guardianship was feasible where caring for respondent put respondent's mother in danger and evidence otherwise revealed "W.A.'s inability to make rational decisions regarding his medical care, mental health, finances, and even daily living").

funding to meet G.J.F.'s housing needs. The supervisor also explained that the organization was understaffed and continuing to take on new clients, and providing intensive support to G.J.F. restricted the services that VOA could provide for other clients.

The record also contains evidence that VOA wanted to reduce the level of services it was providing to G.J.F. The clinical supervisor testified that the resources VOA was providing to G.J.F. were "expensive," and VOA "make[s] it work" but needed capacity to take on more clients so it could meet the housing needs of others in the community. She also testified that VOA petitioned for a full guardianship because it was straining to provide services for G.J.F. that were "outside of the realm" of support that VOA typically provides.

Further, the record establishes that VOA's support could end at any time because G.J.F. might decide to refuse VOA services. VOA's program director testified that when VOA began working with G.J.F., she thought G.J.F. would leave Alaska and abandon VOA's services. The clinical supervisor testified that G.J.F. had "fired" all their previous VOA counselors, and she was the only exception. In contrast, as the court noted, G.J.F. cannot unilaterally "fire" a guardian.[32] G.J.F.'s initial reluctance to work with VOA and G.J.F.'s history of "firing" staff made it prudent for the court to consider the relative instability of VOA assistance when determining whether maintaining the status quo was a "feasible and adequate" alternative to guardianship.[33]

Given G.J.F.'s need for a decision-maker with the authority of a full guardian and the tenuous nature of the level of services VOA had been providing, the court did not clearly err in finding that alternatives to a full guardianship were not feasible and adequate to meet G.J.F.'s needs.

---

[32]    *See* AS 13.26.286.

[33]    AS 13.26.251(d).

## 2. The superior court did not abuse its discretion in refusing to appoint a partial guardian.

The Public Guardian argues that the superior court abused its discretion in appointing a full guardian. It argues that the record "at best supports only a partial guardianship," and therefore AS 13.26.251(e) precluded the court from ordering a full guardianship.

Alaska Statute 13.26.251 provides only broad guidelines that a court must consider when deciding whether to order a full guardianship instead of a partial guardianship.[34] However, AS 13.26.316(c) explains that a full guardian has the power to secure housing; assure the ward's care, comfort, and maintenance; ensure the ward receives services that are essential for their physical health and safety; protect the ward's civil and human rights; consent to medical treatment for the ward; and make financial decisions for the ward. It follows that for the court to appoint a full guardian, it must find that the respondent is in need of a guardian who can exercise all of these powers because (1) the respondent lacks capacity to do so, and (2) less restrictive alternatives do not provide the necessary level of intervention.

The superior court's findings show it determined that G.J.F. needed support in every area in which a full guardian is empowered to act. The court explicitly found that G.J.F. needed assistance with finding housing; completing daily care, living, and maintenance tasks; making financial decisions; and obtaining essential services.

Further, the court found, based on the neuropsychological evaluation, that G.J.F. has an intellectual disability, suffers from short-term memory loss, and has a dissociative identity disorder with ten alter egos, which means they can present as someone as young as six years old. And "overwhelming testimony" established that

---

[34] *See* AS 13.26.251(f) (stating that a court may appoint a full guardian where "respondent is totally without capacity to care for the respondent" and "a combination of alternatives" to full guardianship "is not feasible or adequate to meet" the respondent's needs).

G.J.F. is "incredibly vulnerable" to online predators and struggles to make decisions that are in their best interests. Those findings make clear that G.J.F. needed assistance from someone who can make financial, legal, and medical decisions. The record contains ample support for these findings.

The program director and the clinical supervisor "saw other people taking advantage of [G.J.F.]" and described G.J.F. as "highly vulnerable." The clinical supervisor also testified that because of G.J.F.'s short-term memory loss, they "will forget who in the past has taken advantage of them." Testimony also established that G.J.F. needs help buying basic necessities, finding housing, applying for benefits, and protecting their finances. Further, at times G.J.F. can "present as young as six years old." At the hearing itself, G.J.F.'s attorney sought to protect them from upsetting testimony and had to escort them to the restroom. G.J.F.'s demeanor at the hearing tends to support assertions in the neuropsychological evaluation and testimony that G.J.F. can appear "younger than [their] stated age" and reinforces the court's determination that testimony about G.J.F.'s vulnerability was "particularly credible."[35]

The Public Guardian argues that the only reason VOA petitioned for a full guardianship is "because G.J.F. would age out of services in" several years. Some testimony indicates that providing G.J.F. a long period to adjust to a guardian before they became ineligible for VOA services motivated the timing of VOA's petition. However, the record establishes that G.J.F. needed support from a decision-maker at the time VOA filed the petition. And only a full guardian has the decision-making power that meets the full range of G.J.F.'s needs.

The record contains clear and convincing evidence that G.J.F. requires substantial assistance in nearly all dimensions of their life. And the court's findings,

---

[35] *Cf. Dara v. Gish*, 404 P.3d 154, 163 (Alaska 2017) (holding "the superior court was entitled to draw reasonable inferences from [a party's] testimony and demeanor at trial" in custody case).

which the record supports, show it granted the petition for guardianship based on a determination that G.J.F. requires support with daily living tasks and decision-making that only a full guardian can provide.[36] Therefore, the court did not abuse its discretion in appointing a full guardian as opposed to a partial guardian.[37]

C.     It Was Legal Error to Rely On The Court Visitor's Report, But The Error Was Harmless.

The Public Guardian argues that the court visitor's report and remarks are "essentially meaningless within the record" because the report was not admitted as evidence, and the court visitor did not testify under oath. However, the Public Guardian also recognizes that the visitor's report and remarks contained information that is largely redundant with the neuropsychological report and witness testimony.

We have not previously considered whether and to what extent the superior court may rely on a visitor's report in a guardianship case. The requirement for a visitor and the visitor's role in guardianship proceedings are set out in statute.[38] But the relevant statutes do not specify the circumstances under which the court may rely on the visitor's report in making findings in support of a determination of incapacity or the scope of a guardianship.

The guardianship statutes require the visitor to "file" a report, but "filing," without more, does not allow the superior court to rely on the report as evidence. *Black's Law Dictionary* defines "file" as "deliver[ing] a legal document to the court

---

[36]     *See* AS 13.26.251(f).

[37]     *See Wilson v. State, Dep't of Law*, 355 P.3d 549, 555 (Alaska 2015) ("A court abuses its discretion if it considers improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors." (quoting *Farmer v. Farmer*, 230 P.3d 689, 693 (Alaska 2010))); *see also* AS 13.26.251(f) (listing factors justifying full guardianship).

[38]     AS 13.26.226(c) (setting out court visitor's responsibilities); AS 13.26.236 (setting out requirements of court visitor's evaluation report).

clerk or record custodian for placement into the official record."[39]  And in common legal usage, "filing" generally describes the act of delivering a pleading or other document to the courthouse.[40]  Here, the visitor's report was not admitted into evidence. The visitor was not sworn in as a witness, so her statements to the court are not testimony.  Thus, the visitor's report and her statements did not become "part of the collective mass of things for a tribunal's consideration," because they were never "proffered and admitted as required by the rules of the tribunal."[41]

Because the visitor's report was not in evidence, it was legal error to rely on it, but the error here was harmless.  We "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties and act only when the result is otherwise inconsistent with substantial justice."[42]  As the court noted, much of the information it relied on was from the neuropsychological evaluation, which was admitted into evidence by stipulation.  And the remaining information from the visitor's report that the court relied upon was encompassed by witness testimony.  Therefore, the error did not have "substantial influence" on the court's decision, and it was harmless.[43]

---

[39]    *File*, BLACK'S LAW DICTIONARY (12th ed. 2024); *State v. Jeffrey*, 170 P.3d 226, 232 (Alaska 2007).

[40]    *See, e.g.*, *Silides v. Thomas*, 559 P.2d 80, 88 (Alaska 1977) (noting that "the definition of 'file' is well established in the law" and that a document is "filed only when the proper office has received it").

[41]    *Diego K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 411 P.3d 622, 628 (Alaska 2018).

[42]    *Penn P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 522 P.3d 659, 665 (Alaska 2023) (internal quotation marks omitted) (quoting *In re Hospitalization of Rabi R.*, 468 P.3d 721, 732 (Alaska 2020)); *see also* Alaska R. Civ. P. 61.

[43]    *See Penn P.*, 522 P.3d at 665 (quoting *Martinez v. Bullock*, 535 P.2d 1200, 1206 (Alaska 1975)).  Moreover, G.J.F. does not allege a violation of their due process rights.  *Cf., e.g.*, *Lewis G. v. Cassie Y.*, 426 P.3d 1136, 1147 (Alaska 2018) (rejecting

We recognize that, as a practical matter, the lack of guidance from the statutes and our previous cases has led to courts relying on court visitor reports although they were not entered into evidence. The practice in the analogous medication cases may provide useful assistance. In such hearings, as a matter of course, the court visitor is sworn as a witness to affirm the information in the report.[44]

## V.     CONCLUSION

The superior court's order for a full guardianship is AFFIRMED.

---

appellant's argument that superior court denied right to due process by ignoring Alaska Rules of Civil Procedure).

[44]     *See, e.g.*, *In re Hospitalization of Tonja P.*, 524 P.3d 795, 801 (Alaska 2023) (noting court visitor's testimony in medication administration hearing); *In re Rabi R.*, 468 P.3d at 728-29 (same); *In re Hospitalization of Naomi B.*, 435 P.3d 918, 921 (Alaska 2019) (same).

CARNEY, Justice, dissenting.

I agree with the court, the superior court, and G.J.F. and their supporters that G.J.F. needs support to accomplish many tasks in their daily life. But I disagree that G.J.F. *currently* needs a guardian to ensure that they receive the necessary support. Because they do not need such support until or unless the services they currently receive cease, I believe it was an abuse of discretion to appoint a full guardian. I respectfully dissent.

As the court observes, appointment of a full guardian is such an extreme deprivation of a person's liberty that the legislature has decreed it "shall be used only as necessary" and "only to the extent necessitated."[1] In fact, the deprivation of individual autonomy is second in its extremity only to the involuntary commitment or medication of a person for mental health treatment.[2] We have recognized that as a result, the statute mandates a "strong policy of restraint,"[3] requiring a petitioner to demonstrate by clear and convincing evidence the need for a full guardian.[4]

The statute also requires the court to determine the extent of the person's incapacity and whether less restrictive alternatives to a full guardianship — ranging from a representative payee to handle the person's government benefits to a conservator to handle property and finances to a partial guardianship tailored to the person's demonstrated needs only — will suffice.[5]

---

[1]   Opinion at 10.

[2]   At oral argument, the Public Guardian pointed out that guardianship is "not a resource" to be employed out of beneficence, but rather a deprivation of constitutional rights to be imposed only out of necessity.

[3]   *In re Protective Proc. of Nora D.*, 485 P.3d 1058, 1062 (Alaska 2021) (quoting *In re O.S.D.*, 672 P.3d 1304, 1306 (Alaska 1983)).

[4]   AS 13.26.251(b).

[5]   AS 13.26.251(c).

**A.      It Was Clear Error To Find That VOA Services Could Cease At Any Moment.**

G.J.F. was 22 years old when VOA petitioned for appointment of a full guardian. At the time, they were receiving full wraparound services[6] from VOA. They were housed, receiving mental health and independent living counseling and support, receiving SNAP, Medicaid, and ISW services, and waiting for approval of their applications for an I/DD waiver and Social Security benefits. The record makes clear that the VOA staff who work with G.J.F. are devoted to them and work diligently to support G.J.F. as they enter the adult world.

In order to assist G.J.F., VOA staff petitioned the court to appoint a full guardian for them. Following an initial hearing at which no evidence was presented and at which the petitioner did not even appear, a superior court master recommended the appointment of a full guardian. The superior court properly rejected the unsupported recommendation and convened a hearing.

At that hearing it was the petitioner's burden to present clear and convincing evidence that G.J.F. was, at that time, in need of a full guardian.[7] But neither the petitioner nor the VOA clinical supervisor testified that G.J.F. currently needed a guardian or seemed to have a clear idea of what a guardian could do beyond what VOA was doing. The petitioner, in fact, testified that even though, "I've been working with OPA . . . a lot the last ten years, I don't know what [the Public Guardian] usually does."

The clinical supervisor testified repeatedly that the reason for the petition was to ensure that G.J.F. had support when they turned 25 and "aged out" of VOA

---

[6]      "Wraparound services" is a term of art and refers to comprehensive, holistic services delivered by a supportive, integrated team of providers to an individual experiencing serious mental health or behavioral challenges. *See Wraparound Basics Frequently Asked Questions*, NATIONAL WRAPAROUND INITIATIVE (Jan. 2019), https://nwi.pdx.edu/pdf/wraparound-basics.pdf.

[7]      AS 13.26.215(b).

services. The clinical supervisor testified that VOA "won't be able to meet [G.J.F.'s] needs long-term." She reiterated that "VOA will not be able to work with [G.J.F.] and help to continue to apply for those, renew those, keep those supports in place once they are awarded beyond the age of 25." When the Public Guardian clarified that "the reason that a guardian would become needed is when [G.J.F.] turns 25, these services that have been provided . . . won't be available," the supervisor responded, "Yeah . . . we are doing our due diligence to ensure all of [their] needs are met before [they] end[] services with us." And when questioned directly about why she was supporting the appointment of a guardian at age 22 when G.J.F. would not lose VOA services until age 25, the supervisor responded that it "makes sense to me for us to have that transition."

The court does not acknowledge this testimony. It focuses instead on the supervisor's response to G.J.F.'s attorney's prompt about whether there was "an urgency" beyond G.J.F.'s 25th birthday. The supervisor answered that G.J.F.'s services would end at 25, "but we're a grant-funded program, too. There's no way that we can . . . say without a doubt that we're going to continue to be there for [G.J.F.] through the age of 25."

Based upon this testimony the court concludes that the superior court properly found that VOA services "could cease at any moment." I disagree. The record demonstrates only that VOA staff, out of genuine concern for G.J.F.'s welfare, preemptively filed a petition in anticipation of G.J.F.'s 25th birthday, still over two years away. The mere fact that VOA, like many nonprofit organizations, relies on grants for funding does not support the superior court's finding that its services could "cease at any moment." Few organizations, grant-funded or not, can guarantee "without a doubt" their ability to continue to provide services. And an organization that faces the risk of losing sources of funding must exercise its discretion to prioritize its delivery of services to clients in light of its funding constraints. The court explicitly recognizes that VOA exercised this discretion to "continu[e] to add clients while it diverted a

-24-                                                                                    7746

disproportionate share of resources to help G.J.F."[8] There was no testimony that VOA's funding constraints would result in discontinuing the services provided to G.J.F. That VOA was "grant-funded" and that some grants might not be renewed do not support the finding that the services VOA provides to G.J.F. were at imminent risk of ending. In my opinion it was clear error to find that VOA's services could cease at any moment.

**B.** **It Was An Abuse Of Discretion To Conclude That There Were No Feasible Less Restrictive Alternatives To A Full Guardianship.**

VOA did not present any evidence that less restrictive alternatives to a full guardianship were not feasible. In fact the evidence and testimony at the hearing seemed to show just the opposite. G.J.F.'s counselor testified that VOA had used its resources to apply for benefits for G.J.F. "to pay for all of [G.J.F.'s] financial needs." She testified that VOA had helped G.J.F. apply for "SNAP benefits," "Medicaid renewal," and an ISW waiver. Both the petitioner and G.J.F.'s counselor testified that VOA provided G.J.F. with therapy and counseling. And the counselor admitted that VOA was "capable of providing those needs, but the request is for the guardian, to the extent that they could do those things, be appointed instead."

Alaska Statute 13.26.251 obligates the superior court to "determine . . . the feasibility of alternatives to guardianship to meet the needs of the respondent"[9] and impose a guardianship only if there are no feasible less restrictive alternatives to meet a respondent's needs.[10] The burden is on the petitioner to present clear and convincing evidence of that proposition. But VOA failed to provide any evidence and the superior court failed to consider less restrictive alternatives such as maintaining the status quo,

---

[8]      Opinion at 15.

[9]      AS 13.26.251(c).

[10]      AS 13.26.251(d)-(f).

appointing a representative payee or a conservator, or a partial guardian to meet G.J.F.'s needs.[11]

The superior court found that G.J.F. "requires more [than VOA services], which is where a guardian would come into play" and "pick up where [VOA] cannot assist," but it made no findings about what "more" G.J.F. required or what a guardian could do to meet any unspecified need. Although the court listed assisting G.J.F. "with financial decisions, ensuring all financial benefits are applied for[,] . . . working to get [G.J.F.] into a group home setting, and assisting with organizing counseling services" as examples of needs requiring the appointment of a guardian, testimony at the hearing showed that VOA was *already* assisting G.J.F. with these functions at the time of the hearing. And when asked whether she thought a guardian could do more than VOA was already doing for G.J.F., the supervisor acknowledged that VOA was "capable of providing those needs" but was requesting that a guardian "be appointed instead."

The superior court's order does not identify any of G.J.F.'s needs that were not being met by VOA services. Identifying those needs is a necessary step in the less restrictive alternative analysis. It was manifestly unreasonable to conclude that less restrictive alternatives to a full guardian were not adequate or feasible to meet G.J.F.'s needs without even determining what those unmet needs are.

The court brushes aside the superior court's failure to require the petitioner to demonstrate that less restrictive alternatives were not feasible, noting that the statutes provide "only broad guidelines" for the court to follow in making its decision.[12] But

---

[11]    We have clarified in the somewhat analogous context of mental health commitment cases that the petitioner must affirmatively disprove the feasibility of less restrictive alternatives. *See In re Hospitalization of Sergio F.*, 529 P.3d 74, 80 (Alaska 2023). And we have vacated commitment orders when no such evidence was presented to the court. *See id.* at 80-82; *In re Hospitalization of Declan P.*, 538 P.3d 318, 325-28 (Alaska 2023).

[12]    Opinion at 18.

those guidelines give substance to the legislative dictate that the court's power to appoint a guardian "shall be used only as necessary" and "only to the extent necessitated."[13]

The court compares this case to *In re Protective Proceedings of W.A.*[14] But unlike G.J.F., W.A. was in need of new guardian *at the time of the hearing.*[15] W.A.'s mother had apparently served as his guardian for some time.[16] But in light of her age (81), declining health, and W.A.'s dangerously deteriorating condition, W.A.'s sister filed an emergency petition for immediate appointment of a temporary guardian to replace her mother.[17] There is no such emergency in G.J.F.'s case.

The court proclaims that it will not force "non-profit social service organizations to provide a level of service to a client that is above and beyond what is typical, especially when doing so would risk the organization's ability to provide necessary services to other clients" and "will not place VOA in this dilemma."[18] But in addition to overplaying the risk to other clients, the court overlooks that it was VOA that exercised its discretion to provide services to G.J.F. And if VOA were to decide to scale back its services, at that time it might well be able to demonstrate by clear and convincing evidence that G.J.F. needs a guardian.

The superior court is required to determine whether any less restrictive alternative to full guardianship is feasible.[19] It is to make that determination based upon the clear and convincing evidence presented by a petitioner. Where, as here, no

---

[13]    Opinion at 10.

[14]    193 P.3d 743 (Alaska 2008).

[15]    *Id.* at 745.

[16]    *See id.*

[17]    *Id.*

[18]    Opinion at 16.

[19]    AS 13.26.251(c)-(f).

evidence was presented relating to any less restrictive alternative, it was an abuse of discretion to conclude that none existed.

## C. It Was An Abuse Of Discretion To Appoint A Full Guardian.

In its order appointing a full guardian for G.J.F., the superior court noted that a guardian "will provide [G.J.F.] with a safety net to ensure future services continue without the fear of lack of funding or taxing resources." The court declared that the "receipt of some services provided to [G.J.F.] simply cannot be an automatic disqualifier to appointment of a guardian."

It is unclear to me what impact the court's statement had on its decision. While the statement is accurate, the implication — that receipt of services need not be considered when determining whether, and to what extent, a guardian should be appointed — misapprehends the law. Contrary to that implication, receipt of services may in some cases "disqualify" an individual from appointment of a guardian. And in many cases, receipt of services may help the court to define the limits of the needed guardianship.

To respect the "strong policy of restraint" embodied in the guardianship statutes,[20] the superior court is required to determine the feasibility of less restrictive alternatives and appoint a guardian *only* if no less restrictive alternatives are feasible or adequate to meet a respondent's needs.[21] To make its determination the court must evaluate the services being provided, any needs that existing services are not meeting and that a guardian could meet, and whether there are other less restrictive alternatives to full guardianship to meet those needs. The superior court failed to identify any needs that were not being met by G.J.F.'s VOA services and whether less restrictive alternatives to full guardianship could meet those needs if they existed. It was an abuse of discretion to appoint a full guardian for G.J.F.

---

[20]    *In re Protective Proc. of Nora D.*, 485 P.3d 1058, 1063 (Alaska 2021).

[21]    AS 13.26.251(c)-(f).

I would vacate the guardianship appointment and remand for the superior court to reevaluate G.J.F.'s current needs in light of evidence presented by the petitioner.  I therefore respectfully dissent